## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ ) | | |
| NICHOLAS CURWEN ) | | |
| 116 Greensward Drive ) | | |
| Grantham, NH 03753 ) | CIVIL ACTION | |
| ) | | |
| *Plaintiff*, ) | Case No. 1:24-cv-02948 | |
| ) | | |
| v. ) | | |
| ) | JURY TRIAL DEMANDED | |
| DISTRICT OF COLUMBIA ) | | |
| INTERNATIONAL SCHOOL ) | | |
| 1400 Main Dr., N.W. ) | | |
| Washington, DC 20012 ) | | |
| ) | | |
| *Defendant.* ) | | |
| _____) | | |

## AMENDED COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.     This action has been initiated by Nicholas Curwen (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against the District of Columbia International School (*hereinafter* referred to as "Defendant" or "DCI"), for violations of the Americans with Disabilities Act ("ADA" – 42 U.S.C. § 12101 *et seq*.), the District of Columbia Human Rights Act ("DCHRA" – D.C. Code § 2-1401.01 *et seq*.), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq*.), the District of Columbia Family Medical Leave Act ("DCFMLA" – D.C. Code § 32-501, *et seq*), and for rescission of the severance agreement between Plaintiff and Defendant.

 As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.    This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.  There lies supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.    This Court may properly maintain personal jurisdiction over Defendant because its contacts with the District of Columbia and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4.    Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the District of Columbia.

## PARTIES

5.    Plaintiff is an adult individual, with an address as set forth in the caption. Plaintiff exhausted his administrative claims under the ADA and DCHRA before the EEOC, and these claims are now ripe to be heard in this Court.

6.    Defendant is a public charter school located in the District of Columbia, providing educational services to students in grades 6 through 12.

7.    At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their

employment for Defendant.

8.      Defendant is an "employer" within the meaning of the ADA, DCHRA, FMLA and DCFMLA because Defendant employed at least fifteen (15) or more full-time employees within the present or preceding calendar year for at least twenty (20) calendar weeks and engages in a business that affects interstate commerce.

### FACTUAL BACKGROUND

9.      Plaintiff received an offer letter from Defendant in the summer of 2016, and began teaching in August of 2016 as a high school teacher.

10.     Plaintiff was one of the founding members of DCI, and, with his master's degree in Administrative Leadership and Curriculum Design, was instrumental in developing the school's history curricula.

11.     Throughout his career at DCI, Plaintiff consistently received outstanding performance reviews in his role as a senior teacher focused on teaching high school history, principles of government and providing students writing support.  He served as chair of the history department and taught grades 9 through 12.  As part of his role at Defendant, he also mentored new history teachers.

12.     Beginning in the spring of 2023, and before the end of the school year, Plaintiff began experiencing symptoms of mental illness.  He demonstrated paranoid delusions, expressing to DCI that he believed Defendant's Human Resources and Information Technology departments were out to get him and were interrupting internet service to his classroom so that he could not access his lesson plans.

13.     During the summer, his social media posts became increasingly delusional as his mental health continued to deteriorate.

14.     During DCI's August 2023 professional development week, Plaintiff was showing symptoms typical of schizoaffective bipolar disorder, including anosognosia, grandiosity, pressured speech, racing thoughts, excessive activity, weight loss and altered eating and sleeping patterns.

15.     Separately, Plaintiff suffered from chronic back pain due to a lacerated disc.  This condition was known to Defendant, and Plaintiff periodically used his sick days for treatment.  His back pain became acute in August of 2023 and Plaintiff asked for an exemption from a day of professional development that month.  Plaintiff did not seek an accommodation pursuant to the ADA or DCHRA as a result of this known physical disability, but merely sought to be excused from one day of off-site professional development activities because of a concern that participation may aggravate his back pain.

16.     Consistent with his deteriorating mental health, during DCI's August 2023 professional development program, Plaintiff wrote DCI staff with increasingly unintelligible, disturbing language.   His friends and DCI colleagues became alarmed about his mental state.

17.     In his first effort to remove himself from the classroom while experiencing these symptoms, Plaintiff contacted Defendant's school principal, Mr. Christopher Nace, in August of 2023, seeking a position focused on curriculum design.  This position would have allowed Plaintiff to work outside the school building while receiving treatment for his mental illness.  Mr. Nace never responded to Plaintiff's request.

18.     Subsequently, but also in August 2023, Plaintiff sent Mr. Nace a written proposal to take on the role of experiential learning coordinator, another position that would have allowed Plaintiff to work outside the school building and provide time for him to get treatment for his mental illness.  Again, Mr. Nace did not respond.

19.     Very early Friday morning, August 18, 2023, at 1:28 am (the 1:28 am email) Plaintiff sent Mr. Nace a rambling, disconnected email, expressing clear signs of schizoaffective bipolar disorder, including, as he did earlier in August, anosognosia, grandiosity, pressured speech and racing thoughts.

20.     Upon information and belief, at the start of the work day (The August 2023 professional development was ongoing at the time) Mr. Nace agreed to meet Plaintiff at his home later that day to discuss Plaintiff's 1:28 am email.

21.     At 1:54 pm, August 18, 2023, (the 1:54 pm email) Plaintiff, consistent with the symptoms of his mental illness he had been exhibiting since the spring of 2023, sent another meandering, disjointed and unintelligible email to DCI executive director Michael Rosskamm, Mr. Nace and others, expressing extreme paranoid beliefs as a basis for the desire to leave DCI, while also seeking a leave of absence as an accommodation to allow for treatment of his mental illness.

22.     Upon information and belief, Mr. Rosskamm, understanding that Plaintiff was experiencing a mental health crisis, planned to call the police to check on Plaintiff, but did not when he was informed that three of Plaintiff's DCI colleagues were going to go to Plaintiff's home.

23.     These three colleagues, seeing Plaintiff in crisis, called Plaintiff's partner, who was at work, and told him he must come to Plaintiff's home.

24.     Even before Plaintiff's partner's arrival, Plaintiff's three DCI colleagues determined that Plaintiff's mental state necessitated the care of a mental health crisis team.  These DCI colleagues called the mental health crisis team, and following the team's evaluation, the mental health crisis team advised Plaintiff to voluntarily seek hospitalization.

25.     Despite the team's recommendation and urging by Plaintiff's DCI colleagues, while in the throes of his mental health crisis, and obviously not competent to make decision concerning his

care, Plaintiff refused. The mental health crisis team stated that they would return the next day, and if Plaintiff's condition did not improve, they would initiate involuntary hospitalization.

26.    Upon information and belief, Plaintiff's colleagues – who were witness to Plaintiff's mental health crisis and the mental health crisis team's recommendation – informed DCI administrators that Plaintiff was suffering from a severe mental health crisis.

27.    Upon information and belief, given DCI's understanding of Plaintiff's condition, Mr. Nace canceled his meeting with Plaintiff without notice – he simply did not come to Plaintiff's apartment as scheduled.

28.    In sum, Plaintiff's mental illness was known to Defendant as early as spring of 2023, and Defendant's executive director and principal both knew in August (at the latest) that Plaintiff was experiencing a mental health crisis and was not competent to make decision concerning his care.

29.    Further, three of Defendant's employees – with agreement of DCI's leadership – witnessed Plaintiff's continued deteriorating mental state, culminating in DCI staff calling a mental health crisis team and urging Plaintiff to obtain emergency mental health care.

30.    This knowledge of Plaintiff's mental state provided Defendant notice that Plaintiff was not competent to make decisions concerning his own care, and not legally competent to make personal decisions affecting his employment.

31.    Given the language in both the 1:28 am email and the 1:54 pm email, Plaintiff's writing itself provided further notice to Defendant that Plaintiff was suffering from mental illness, was experiencing a severe mental health crisis, was incapable of making decisions impacting his employment with Defendant, and that he was requesting a leave of absence as an accommodation.

32.    Less than 20 minutes after receiving Plaintiff's 1:54 pm email, and demonstrating Defendant's long running knowledge and discussion of Plaintiff's mental illness, Defendant's

Executive Director, Michael Rosskamm forwarded the email to DCI legal counsel, Adam Simons of McGuireWoods, LLP, carbon copying Mr. Nace and Chief Operating Officer Denise Lyons, stating "Here is the latest.  Any feedback on how to move forward?"

33.    Given the language in the email ("Here is the latest"), it is apparently that this email was a continuation of DCI's previous discussions within DCI and with its legal counsel about Plaintiff's mental health crisis and how to handle it.  Further, Mr. Rosskamm's email to Mr. Simons establishes that DCI did not know how to consider Plaintiff's 1:54 pm email, in which his known mental illness was clearly deteriorating and the email contained both suggestions of resignation and a request for accommodation to treat his current mental health crisis.

34.    As a consequence, DCI sought legal advice that ultimately resulted in Defendant's scheme to take advantage of Plaintiff's mental incompetence, and terminate this a long-tenured, successful teacher – who they knew was suffering from mental illness and experiencing at the time a severe mental health crisis rendering him incapable of making competent decisions  – rather than comply with the ADA, DCHRA, FMLA, DCFMLA, and Defendant's own employment policies, and consider Plaintiff's request for accommodation through a leave of absence by engaging in the statutorily required interactive process, and providing Plaintiff his statutorily protected leave under the FMLA and DCFMLA.

35.    On Saturday, August 19, 2023, the mental health crisis team came back to Plaintiff's home, and showing continued symptoms of severe a mental health crisis, Plaintiff was involuntarily taken to George Washington Hospital.

36.    On Sunday, August 20, 2023, Plaintiff was involuntarily transferred to the Psychiatric Institute of Washington (PIW).

37.    The first business day following this weekend hospitalization, Monday, August 21, 2023,

Plaintiff's father sent an email to Defendant's Human Resources Department, providing Defendant an update on Plaintiff's condition, including informing Defendant that he was diagnosed with "some form of acute manic depression," transferred to PIW, and sought to determine what DCI benefits were available to support his son during this time, including short term disability.

38.    In the email, Plaintiff's father implored Defendant that his son "is in need of [DCI's] support," asking that the school contact him because Plaintiff did not have access to a phone while hospitalized, and to "get back to us as soon as possible [because it was] critical that we understand his health care benefits so that we can facilitate the best possible recovery plan for him."

39.    Plaintiff's father made clear that for the best possible outcome of Plaintiff's mental health crisis, continuation of Plaintiff's employment at DCI, and the continuation of its employee health benefits, was paramount.

40.    Plaintiff's father received an auto-response from the school's Human Resources Department that expressly stated Defendant received the email and would respond in short order.

41.    Consistent with DCI's scheme to terminate Plaintiff rather than provide the requested leave to treat his known disability, Defendant never responded to Plaintiff's father's email.

42.    Instead, on that same date, and hours after Plaintiff's father provided additional notice to DCI that Plaintiff was suffering from a severe mental health crisis and was seeking an accommodation to allow him to recover, Defendant's director of HR, Melina Jimenez-Flores – in pursuit of DCI's scheme to terminate Plaintiff by ignoring the notice of disability and requests for accommodation by Plaintiff and his father, and knowing that Plaintiff was in a psychiatric hospital at the time and wanting to take advantage of his current lack of competency to resign, as well as bind himself to a contract – emailed Plaintiff attaching a severance agreement.

43.    In keeping with Defendant's scheme to terminate Plaintiff rather than accommodate his

known mental illness, DCI, for the first time, characterized Plaintiff's 1:54 pm email (incorrectly described as a 2024 email by Ms. Jimenez-Flores) as a "resignation," ignoring his request for accommodation, his father's earlier notification of Plaintiff's mental health crisis and request for accommodation, and the mental health issues long-known to Defendant.

44.    On August 24, 2023, while continuing to suffer from his severe mental health crisis, Plaintiff emailed his principal, Mr. Nace.  In the email to Mr. Nace, Plaintiff again asked for an accommodation through a leave of absence, this time asking for FMLA paperwork.

45.    Instead of receiving responses to this email and the other emails referenced above – and with knowledge of (1) Plaintiff's mental health condition, (2) that he had been involuntarily committed to PIW, and (3) that both Plaintiff and his father asked for a reasonable accommodation and leave under the FMLA – Defendant sent Plaintiff another email attaching the severance agreement.

46.    On August 28, 2023, DCI HR Director Ms. Jimenez-Flores emailed Plaintiff, now mischaracterizing his August 18 email as an "abrupt[]" resignation that DCI was accepting, and stated that DCI had "sent you separation paperwork in which we offer to pay the equivalent of 3 months of health insurance.  DCI has not yet heard back from you about this.  Please let us know if you will be signing the separation agreement so we can provide you with funding for your insurance."

47.    An hour after receiving this email from HR, Plaintiff emailed Ms. Jimenez-Flores and included Mr. Nace, along with Aryan Bocquet and Noah Dougherty (members of Defendant's Senior Leadership Committee).  In that communication, Plaintiff, in response to DCI's representation that Defendant now considered his 1:54 pm email as a resignation, explained what Defendant had already known – that he had written that email while experiencing a severe mental

health crisis and accordingly, was not competent to make decisions about his employment and wanted to "take that back." He also again asked for leave pursuant to the FMLA, and given the rambling nature of his email, was clearly still experiencing mental health issues.

48.    Beginning August 28, 2023, Plaintiff's mother repeatedly called Defendant's HR department and Mr. Rosskamm on Plaintiff's behalf, asking DCI to engage in the interactive process and provide her son accommodation. Like Plaintiff's father's August 21, 2023 email and Plaintiff's repeated emails seeking FMLA leave, Plaintiff's mother did not receive a response.

49.    On September 6, 2023, in the throes of his mental health crisis and in light of Defendant's tacit refusal to engage in the interactive process and determine a reasonable accommodation, Plaintiff, now desperate to continue having insurance coverage so that he could continue receiving treatment for his mental health issues and continued coverage for his chronic back pain, signed the severance agreement.

50.    As is clear from the history above, Defendant took advantage of Plaintiff's mental illness incapacity and acute need for health coverage by pressuring him to sign the severance agreement as a means of ridding itself of Plaintiff, while also shielding itself from certain liability for its knowing violations of the ADA, DCHRA, FMLA, DCFLMA and its own employment policies.

51.    In short, following repeated discussions with DCI legal counsel, Defendant knew what it was doing – refusing to comply with federal and state laws meant to protect employees suffering from disability, like Plaintiff – and manipulated this disabled, incompetent employee in an attempt to provide cover for Defendant's blatantly unlawful conduct.

52.    Following Plaintiff signing the severance agreement, Plaintiff's mother followed up on her August and September phone calls with an October 2023 letter addressed to Mr. Rosskamm again explaining that Plaintiff was hospitalized at PIW and diagnosed with schizoaffective bipolar

disorder, and that given his illness, it was of the utmost importance that he maintain his insurance coverage (at the time, and pursuant to the severance agreement, Plaintiff's health insurance was set to expire at the end of November).

53.    Mr. Rosskamm did not respond for a more than a month, and when he did on December 2, 2023, he made it clear that Defendant, reliant on the severance agreement – executed by Plaintiff when DCI knew his mental illness rendered him incapable of forming a binding contract – would not engage in the interactive process and would not provide him a reasonable accommodation, including leave under the FMLA, DCFMLA and Defendant's short-term and long-term disability policies.

54.    Plaintiff's mother again wrote Mr. Rosskamm on January 17, 2024 seeking recission of the severance agreement and again demanded that DCI provide Mr. Curwen the disability benefits to which he was entitled.

55.    On January 22, 2024, and in keeping with its scheme to deny Plaintiff the protections federal and state law provided to disabled employees, Mr. Simons of McGuireWoods, legal counsel for Defendant, responded in writing to Plaintiff's mother's January 17, 2024 letter, expressly stating that Defendant was refusing to rescind the severance agreement secured when it knew Plaintiff did not have the capacity to bind himself to a contract, and that it would not reinstate him as an employee of DCI and therefore comply with the requirements of the ADA, DCHRA, FMLA, DCFMLA, and the provisions of its own employment policies.

56.    As a direct result of Defendant's conduct, Plaintiff's mental health continued to deteriorate.

57.    The severance agreement provided no monetary consideration, just 3 months of health care coverage, forcing Plaintiff  to leave his home and partner in Washington, D.C. to live with his parents in New Hampshire and continue his mental health treatment in New England.

58.    Had Defendant complied with the ADA, DCHRA, FMLA and DCFLMA instead of doing whatever it could to rid itself of its highly respected and well-performing teacher, Plaintiff would have been afforded the healthcare necessary to get well and continue working for DCI, while remaining in his home with his partner.

59.    Instead, Plaintiff was forced to uproot his entire life, leaving his home, partner and support network in Washington, D.C. to live with his parents in New Hampshire, and treat his schizoaffective bipolar disorder in New England.

60.    Due to Defendant's actions, Plaintiff suffered an exacerbation of his schizoaffective bipolar disorder, resulting in a prolonged mental health crisis that would have been averted had Defendant complied with the law and provided him reasonable accommodation, including the requested leave under the FMLA and DCFMLA.

61.    This harm to his mental health caused by Defendant has resulted in Plaintiff remaining in the care of his parents in New Hampshire, where he does not hold certification to teach or even a history of teaching in the area's schools.  As a consequence, although Plaintiff obtained a teaching position in a classroom setting in New Hampshire, Defendant's conduct has prevented him from securing comparable employment with like compensation and benefits.

**COUNT I**
**Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination;**
**[2] Retaliation; and [3] Failure to Accommodate)**

62.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

63.    Plaintiff suffered from qualifying health conditions under the ADA which affected his ability to perform some daily life activities, including, but not limited to caring for oneself, concentrating, thinking and working.

64.    Defendant's management knew of Plaintiff's serious mental health condition and the need for psychiatric treatment and other accommodations through Plaintiff's conduct and writings beginning in the spring of 2023, Defendant's employees witnessing Plaintiff in mental health crisis, and Plaintiff's parents informing Defendant of his mental health diagnosis and need for reasonable accommodation.

65.    Notwithstanding Plaintiff's aforementioned mental health conditions and limitations, he was capable of performing the essential functions of his job with the accommodation he sought.

66.    Plaintiff requested reasonable accommodations from Defendant, including medical leave to continue treatment for his mental illness.

67.    Plaintiff was subjected to hostility and animosity due to his mental health condition and his request for accommodations through Defendant scheming to terminate Plaintiff by ignoring Plaintiff's incapacity to make competent employment decisions (and thereby claiming that Plaintiff resigned from employment while in the throes of his severe mental health crisis) and pressuring Plaintiff to leave employment and sign a severance agreement in exchange for three months of health coverage, which Defendant was told he was desperate to maintain in order to continue receiving treatment for his mental illness.

68.    Any purported justification for Plaintiff's discharge from DCI was pretextual, designed to conceal the true discriminatory motive underlying his discharge.

69.    In ignoring Plaintiff's request for accommodation, Defendant failed to engage in the interactive process.  Instead, Plaintiff was terminated because of his disability and for requesting a reasonable medical accommodation.

70.    Defendant acted with malice and wanton disregard for Plaintiff's rights under the ADA.

71.    Plaintiff believes, and therefore avers, that he was terminated by Defendant due to (1) his

known and/or perceived disability; (2) his record of impairment; (3) his requested accommodation (which constitutes illegal retaliation); and/or (4) Defendant's failure to accommodate Plaintiff.

72.     As a result of Defendant's willful violations of the ADA, Plaintiff is entitled to damages, including back pay, front pay, compensatory and emotional distress damages and punitive damages of no less than $200,000 for this claim, plus interest, and attorney's fees and costs pursuant to 42 U.S.C §§ 12117(a), 2000e-5(g).

**COUNT II**
**District of Columbia Human Rights Act (DCHRA)**
**([1] Actual/Perceived/Record of Disability Discrimination;**
**[2] Retaliation; and [3] Failure to Accommodate)**

73.     Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

74.     Plaintiff suffered from qualifying health conditions under the DCHRA which affected his ability to perform some daily life activities, including, but not limited to caring for oneself, concentrating, thinking and working.

75.     Defendant's management knew of Plaintiff's serious mental health condition and the need for psychiatric treatment and other accommodations through Plaintiff's conduct and writings beginning in the Spring of 2023, Defendant's employees witnessing Plaintiff in mental health crisis, and Plaintiff's parents informing Defendant of his mental health diagnosis.

76.     Notwithstanding Plaintiff's aforementioned mental health conditions and limitations, he was capable of performing the essential functions of his job with the accommodation he sought.

77.     Plaintiff requested reasonable accommodations from Defendant, including medical leave to continue treatment for his mental illness.

78.     Plaintiff was subjected to hostility and animosity due to his mental health condition and his request for accommodations through Defendant scheming to terminate Plaintiff by ignoring

Plaintiff's incapacity to make competent employment decisions (and thereby claiming that Plaintiff resigned from employment while in the throes of his severe mental health crisis) and pressuring Plaintiff to leave employment and sign a severance agreement in exchange for three months of health coverage, which Defendant was told he was desperate to maintain in order to continue receiving treatment for his mental illness.

79.    Any purported justification for Plaintiff's discharge from DCI was pretextual, designed to conceal the true discriminatory motive underlying his discharge.

80.    In ignoring Plaintiff's request for accommodation, Defendant failed to engage in the interactive process.  Instead, Plaintiff was terminated because of his disability and for requesting a reasonable medical accommodation.

81.    Defendant's discriminatory acts and intentions were malicious, and in willful, wanton and reckless disregard of Plaintiff's rights under the DCHRA.

82.    Plaintiff believes, and therefore avers, that he was terminated by Defendant due to (1) his known and/or perceived disability; (2) his record of impairment; (3) his requested accommodation (which constitutes illegal retaliation); and/or (4) Defendant's failure to accommodate Plaintiff.

83.    As a result of Defendant's willful violations of the DCHRA, Plaintiff is entitled to damages, including back pay, front pay, compensatory and emotional distress damages and punitive damages of no less than $1,000,000 for this claim, plus interest, and attorney's fees and costs pursuant to D.C. Code § 2-1403.13.

<div align="center">

**COUNT III**
**Family and Medical Leave Act ("FMLA")**
**(Interference & Retaliation)**

</div>

84.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

85.    Plaintiff was clearly an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. § 2611(2)(a)(i)(ii).

86.    Plaintiff requested leave from Defendant, his employer, with whom he had been employed for at least twelve (12) months pursuant to the requirements of 29 U.S.C.A. § 2611(2)(i).

87.    Further, Plaintiff had at least 1,250 hours of service with Defendant during the prior twelve (12) months.

88.    Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A. § 2611(4)(A)(i).

89.    Plaintiff was entitled to leave, pursuant to 29 U.S.C.A. § 2612(a)(1) due to his known, serious mental health condition.

90.    Defendant committed interference and retaliation violations of the FMLA by: (1) refusing to acknowledge and grant leave under the FMLA when Plaintiff and his parents requested leave under the Act to provide care for his known mental illness; (2) taking advantage of Plaintiff's incapacity to make competent decisions concerning his employment and terminating Plaintiff to avoid providing the requested leave as an accommodation for his known mental illness; and (3) coercing Plaintiff to sign the severance agreement in response to Plaintiff and his parents seeking leave under the Act.

91.    Defendant's actions were willful and in bad faith, causing Plaintiff to suffer lost wages, benefits and emotional distress.

92.    As a result of Defendant's willful violations of the FMLA, Plaintiff is entitled to damages, including back pay, front pay, and liquidated damages of no less than $300,000 for this claim, plus interest, and  attorney's fees and costs pursuant to 29 U.S.C. § 2617.

## COUNT IV
### District of Columbia Family and Medical Leave Act ("DCFMLA")
### (Interference & Retaliation)

93.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

94.    Plaintiff was clearly an eligible employee under the definitional terms of the District of Columbia Family and Medical Leave Act, D.C. Code § 32-501, *et seq.*

95.    Plaintiff requested leave from Defendant, his employer, with whom he had been employed for at least twelve (12) months in the seven (7) years immediately preceding the date on which the period of medical leave was to commence pursuant to the requirements of D.C. Code § 32-501(1)(A)(i).

96.    Further, Plaintiff had at least 1,000 hours of service with Defendant during the twelve (12) month period referenced in the preceding paragraph, pursuant to D.C. Code § 32-501(1)(A)(ii).

97.    Defendant satisfies the definition of "employer" under the DCFMLA in that it uses the services of another individual for pay in the District of Columbia.  D.C. Code § 32-501(2).

98.    Plaintiff was entitled to leave, pursuant to D.C. Code § 32-503(a) due to his known, serious mental health condition.

99.    Defendant committed interference and retaliation violations of the DCFMLA by: (1) refusing to acknowledge and grant leave under the DCFMLA when Plaintiff and his parents requested leave under the Act to provide care for his known mental illness; (2) taking advantage of Plaintiff's incapacity to make competent decisions concerning his employment and terminating Plaintiff to avoid providing the requested leave as an accommodation for his known mental illness; and (3) coercing Plaintiff to sign the severance agreement in response to Plaintiff and his parents seeking leave under the Act.

100.    Defendant's actions were willful and in bad faith, causing Plaintiff to suffer lost wages, benefits and emotional distress.

101.    As a result of Defendant's willful violations of the DCFMLA, Plaintiff is entitled to damages, including back pay, front pay, compensatory and emotional distress damages, and punitive damages of no less than $1,000,000 for this claim, plus interest, and attorney's fees and costs pursuant to D.C. Code § 32-509(b)(6) and (b)(7).

## COUNT V
### Rescission of Severance Agreement

102.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

103.    The severance agreement signed by Plaintiff is void ab initio or voidable and subject to rescission based on duress, undue influence and Plaintiff's known incompetency to enter into a binding contract.

104.    Defendant knew before August of 2023 that Plaintiff was suffering from a severe mental health crisis and lacked the competency to resign and legally bind himself to a contract.

105.    In furtherance of its scheme to manipulate this disabled, incompetent employee in an attempt to provide cover for Defendant's blatantly unlawful conduct, Defendant took advantage of Plaintiff's vulnerable state, actively ignored Plaintiff's incapacity to make competent decisions concerning his employment, and knowingly pressured Plaintiff into signing the severance agreement by threatening to end his medical benefits should he not agree to the severance's provisions.  Lacking competency at the time Defendant placed its undue influence on Plaintiff, and desperate to retain his health insurance to continue receiving care for his lacerated disc and required mental health care while in the throes of his mental health crisis, Defendant unlawfully pressured Plaintiff into signing the severance agreement.

106.    As a result of Defendant taking advantage of Plaintiff's known disability rendering him incompetent to legally bind himself to the severance agreement, Plaintiff seeks rescission of the severance agreement and restoration of all rights and benefits he would have had but for the unlawful execution of the agreement.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    The severance agreement between Plaintiff and Defendant is rescinded;

B.    Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, insurance, benefits, training, promotions, reinstatement, and seniority;

C.    Plaintiff is to be awarded punitive damages and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

E.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and District of Columbia law;

F.    Plaintiff is to be given a jury trial as demanded in the caption of the instant Complaint.

## <u>JURY DEMAND</u>

Plaintiff demands a jury trial on claims so triable.

Dated: January 21, 2025

<div style="margin-left:40%">

Respectfully submitted,

/s/ Scott M. Lempert
Scott M. Lempert, Esq. (DC Bar No. 448421)
Pamela M. Keith, Esq. (DC Bar No. 1045184)
CENTER FOR EMPLOYMENT JUSTICE, LLC
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725
scottlempert@centerforemploymentjustice.com
pamkeith@centerforemploymentjustice.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a true and correct copy of Plaintiff's Amended Complaint was sent by electronic filing on this 21st day of January, 2025 to all counsel of record.


_/Scott M. Lempert_____
Scott M. Lempert