**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| NICHOLAS CURWEN, |
|                 *Plaintiff*, |
|     v. |
| DISTRICT OF COLUMBIA |
| INTERNATIONAL SCHOOL, |
|                 *Defendant*. |

Civil Action No. 24‑2948 (SLS)

Judge Sparkle L. Sooknanan

**<u>MEMORANDUM OPINION</u>**

Nicholas Curwen, a former history teacher at the District of Columbia International School (DCI), sued the school under the Americans with Disabilities Act (ADA), the District of Columbia Human Rights Act (DCHRA), the Family and Medical Leave Act (FMLA), and the District of Columbia Family Medical Leave Act (DCFMLA), alleging that DCI ignored his requests for help during a mental health crisis and forced him to sign a severance agreement. DCI has moved to dismiss Mr. Curwen's claims under Federal Rule of Civil Procedure 12(b)(6). The Court denies the motion in part and grants it in part.

**BACKGROUND**

**A.    Factual Background**

The Court draws the facts, accepted as true, from the Plaintiff's Amended Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). In addition, the Court considers an email attached to the Defendant's motion (Exhibit 1), also attached to the Plaintiff's opposition, "upon which [the Amended Complaint] necessarily relies," *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011).

Mr. Curwen started teaching at DCI in August 2016. *See* Am. Compl. ¶ 9, ECF No. 9. He served as a senior history teacher and department chair and "consistently received outstanding performance reviews[.]" *Id.* ¶ 11. But in the spring of 2023, Mr. Curwen "began experiencing symptoms of mental illness." *Id.* ¶ 12. "He demonstrated paranoid delusions, expressing to DCI that he believed [its] Human Resources and Information Technology departments were out to get him and were interrupting internet service to his classroom so that he could not access his lesson plans." *Id.* And by the summer he "was showing symptoms typical of schizoaffective bipolar disorder, including anosognosia, grandiosity, pressured speech, racing thoughts, excessive activity, weight loss and altered eating and sleeping patterns." *Id.* ¶ 14. He wrote to DCI staff with "increasingly unintelligible, disturbing language," after which his "friends and DCI colleagues became alarmed about his mental state." *Id.* ¶ 16.

In August 2023, Mr. Curwen made his "first effort to remove himself from the classroom" by asking DCI's principal, Christopher Nace, for a position "focused on curriculum design" that "would have allowed [him] to work outside the school building while receiving treatment for his mental illness." *Id.* ¶ 17. That same month, Mr. Curwen sent Principal Nace a "written proposal to take on the role of experiential learning coordinator, another position that would have allowed [Mr. Curwen] to work outside the school building and provide time for him to get treatment for his mental illness." *Id.* ¶ 18. Principal Nace did not respond to either request. *Id.* ¶¶ 17, 18.

On August 18, 2023, at 1:28 a.m., Mr. Curwen sent Principal Nace "a rambling, disconnected email" that "express[ed] clear signs" of "anosognosia, grandiosity, pressured speech and racing thoughts." *Id.* ¶ 19. And at 1:54 p.m. on that same day, he sent a "meandering, disjointed and unintelligible email" to DCI's executive director, Michael Rosskamm, with the subject line "I QUIT." *Id.* ¶ 21; Def.'s Mot., Ex. 1 at 1, ECF No. 10-3; Pl.'s Opp'n, Ex. 2 at 1, ECF No. 12-2.

In the lengthy email, he apologized for "hurt[ing] people in [the] building" and said that he would "rather quit before [getting] fired" "because of the hostile work environment." Def.'s Mot., Ex. 1 at 1–2. According to Mr. Curwen, the email sought "a leave of absence as an accommodation to allow for treatment of his mental illness." Am. Compl. ¶ 21. Director Rosskamm forwarded the email to DCI's legal counsel, copying Principal Nace and DCI's Chief Operating Officer, writing: "Here is the latest. Any feedback on how to move forward?" *Id.* ¶ 32.

Mr. Curwen alleges that after the 1:54 p.m. email, Director Rosskamm "underst[ood] that [he] was experiencing a mental health crisis[ and] planned to call the police to check on [him], but did not when he was informed that three of [Mr. Curwen's] DCI colleagues were going to go to [his] home." *Id.* ¶ 22. His colleagues determined that his "mental state necessitated the care of a mental health crisis team" and called one to the scene. *Id.* ¶ 24. The mental health crisis team recommended that Mr. Curwen voluntarily seek hospitalization but he refused. *Id.* ¶¶ 24–25. The next day, Mr. Curwen was "involuntarily taken to George Washington Hospital" and later "involuntarily transferred to the Psychiatric Institute of Washington (PIW)." *Id.* ¶¶ 35–36.

On August 21, 2023, Mr. Curwen's father emailed DCI's Human Resources Department "to determine what DCI benefits were available to support his son during this time, including short term disability," explaining that Mr. Curwen had been "diagnosed with 'some form of acute manic depression.'" *Id*. ¶ 37. He received an auto-response that DCI had "received the email and would respond in short order," *id.* ¶ 40, but DCI never responded, *id.* ¶ 48. On the same day, DCI's Director of Human Resources emailed Mr. Curwen a severance agreement and "characterized [his] 1:54 pm email . . . as a 'resignation[.]'" *Id.* ¶¶ 42–43. DCI sent the severance agreement "knowing that [Mr. Curwen] was in a psychiatric hospital at the time," which showed that it was using the

opportunity to "take advantage of his . . . lack of competency to resign" or to "bind himself to a contract[.]" *Id.* ¶ 42.

"On August 24, 2023, while continuing to suffer from his severe mental health crisis," Mr. Curwen emailed Principal Nace, "again ask[ing] for an accommodation through a leave of absence, this time asking for FMLA paperwork." *Id.* ¶ 44. DCI then sent another email attaching the severance agreement. *Id.* ¶ 45. On August 28, 2023, DCI's Human Resources director emailed Mr. Curwen, "mischaracterizing his August 18[, 1:54 p.m.] email as an 'abrupt[]' resignation that DCI was accepting[.]" *Id.* ¶ 46. She stated that the school had sent Mr. Curwen "separation paperwork in which [it] offer[ed] to pay the equivalent of 3 months of health insurance" and "ha[d] not yet heard back[.]" *Id.* An hour later, Mr. Curwen replied that he had "written that [1:54 p.m.] email while experiencing a severe mental health crisis and accordingly, was not competent to make decisions about his employment and wanted to 'take that back.'" *Id.* ¶ 47. He "again asked for leave pursuant to the FMLA" and alleges that it was clear he was "still experiencing mental health issues." *Id.* Mr. Curwen's mother also "repeatedly called [DCI's] HR department" on her son's behalf, asking DCI to "engage in the interactive process" and to "provide her son accommodation." *Id.* ¶ 48. She did not receive a response. *Id.*

Finally, on September 6, "in the throes of his mental health crisis" and "in light of [DCI's] tacit refusal to engage in the interactive process and determine a reasonable accommodation," Mr. Curwen signed the severance agreement out of "desperat[ion]," in order to "hav[e] insurance coverage so that he could continue receiving treatment for his mental health[.]" *Id.* ¶ 49. Mr. Curwen claims that DCI "took advantage of [his] mental illness incapacity and acute need for health coverage by pressuring him to sign the severance agreement as a means of ridding itself of

[Mr. Curwen], while also shielding itself from certain liability for its knowing violations of the ADA, DCHRA, FMLA, [and] DCFMLA[.]" *Id.* ¶ 50.

In October 2023, with just one month of insurance coverage remaining, Mr. Curwen's mother wrote to Director Rosskamm "explaining that [Mr. Curwen] was hospitalized" and "diagnosed with schizoaffective bipolar disorder, and that given his illness, it was of the utmost importance that he maintains his insurance coverage[.]" *Id.* ¶ 52. Director Rosskamm responded more than a month later that DCI would not be providing further assistance because of the severance agreement. *See id.* ¶ 53. On January 17, 2024, Mr. Curwen's mother sent another email "seeking recission of the severance agreement and again demanded that DCI provide Mr. Curwen the disability benefits to which he was entitled." *Id.* ¶ 54. On January 22, 2024, DCI's legal counsel "refus[ed] to rescind the severance agreement[.]" *Id.* ¶ 55.

Because the severance agreement provided only three months of health care coverage, Mr. Curwen "le[ft] his home and partner in Washington, D.C. to live with his parents in New Hampshire and continue his mental health treatment in New England." *Id.* ¶ 57. DCI's actions caused "an exacerbation of his schizoaffective bipolar disorder, resulting in a prolonged mental health crisis that would have been averted had [it] complied with the law and provided him reasonable accommodation, including the requested leave under the FMLA and DCFMLA." *Id.* ¶ 60. Although Mr. Curwen obtained another teaching position in New Hampshire, the compensation and benefits are not comparable to his prior position at DCI. *Id.* ¶ 61.

### B.    Procedural Background

Mr. Curwen filed his operative Amended Complaint on January 21, 2025. *See* Am. Compl. Counts 1 and 2 allege that DCI violated the ADA and the DCHRA by discriminating and retaliating against him because of his disability. *Id.* ¶¶ 62–83. Counts 3 and 4 allege that DCI violated the

FMLA and the DCFMLA by retaliating against him and interfering with his rights guaranteed under those statutes. *Id.* ¶¶ 84–101. And Count 5 alleges that the severance agreement is voidable because Mr. Curwen lacked competency to consent when he signed it. *Id.* ¶¶ 102–06. On February 4, 2025, DCI moved to dismiss Mr. Curwen's claims under Federal Rule of Civil Procedure 12(b)(6). *See* Mot. Dismiss, ECF No. 10. The matter is fully briefed and ripe for review. *See* Pl.'s Opp'n, ECF No. 12, Def.'s Reply, ECF No. 13.

## LEGAL STANDARD

Under Rule 12(b)(6), a court must dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (cleaned up). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an "inference[ ] . . . unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gilliard v. Gruenberg*, 302 F. Supp. 3d 257, 274 (D.D.C. 2018).

## DISCUSSION

DCI argues that Mr. Curwen's claims should be dismissed under Rule 12(b)(6). *See* Mot. Dismiss at 6–20. The Court agrees that his discrimination claims do not survive. But accepting his allegations as true, his retaliation, interference, and rescission of contract claims survive dismissal. Ultimately, DCI may establish that Mr. Curwen is a "disgruntled employee" who "voluntarily resigned," Def.'s Reply at 1, rather than a mentally ill employee who was denied support and

coerced into signing a severance agreement. But those arguments do not carry the day at this early stage of the case.

### A.    Discrimination (Counts 1 and 2)

Mr. Curwen first alleges that DCI discriminated against him because of his disability in violation of the ADA and the DCHRA. *See* Am. Compl. ¶¶ 62–83. The ADA prohibits certain employers from "discriminat[ing] against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). And the DCHRA prohibits employers in the District of Columbia from discriminating against any individual "wholly or partially for a discriminatory reason based upon the actual or perceived . . . disability . . . of any individual[.]" D.C. Code § 2–1402.11(a)(1). "Employment discrimination claims under the DCHRA are analyzed using the same legal framework as federal employment discrimination claims." *Badwal v. Bd. of Trs. of Univ. of D.C.*, 139 F. Supp. 3d 295, 308 (D.D.C. 2015) (cleaned up).

"A disability discrimination claim can take one of four forms: (1) intentional discrimination, otherwise known as disparate treatment; (2) disparate impact; (3) hostile work environment; or (4) failure to accommodate." *Id*. Mr. Curwen alleges failure to accommodate, which requires him to establish (1) that he "has a disability under the ADA"; (2) that his employer "had notice of the disability"; (3) that he "could perform the essential functions of [his] position either with reasonable accommodation or without it"; and (4) that his employer "refused to make the accommodation." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018), *cert. denied*, 586 U.S. 1185 (2019). He has not plausibly alleged all of these elements.

#### 1.    Disability Status

A plaintiff is disabled if "(1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial."

*Haynes v. Williams*, 392 F.3d 478, 481–82 (D.C. Cir. 2004) (citations omitted). "'Major life activities' include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'" *Hester v. Paul Pub. Charter Sch.*, No. 21-cv-3166, 2023 WL 355913, at *5 (D.D.C. Jan. 23, 2023) (quoting 42 U.S.C. § 12102(2)(A)). "The term 'substantially limits' shall be construed broadly in favor of expansive coverage and is not meant to be a demanding standard." *Smith-Haynie v. United States Veterans Initiative*, No. 17-cv-2824, 2020 WL 2838605, at *3 (D.D.C. June 1, 2020) (cleaned up).

Mr. Curwen satisfies this standard. First, he alleges that he suffers from mental health conditions, including schizoaffective bipolar disorder. *See* Am. Compl. ¶¶ 14, 52. Second, he claims these conditions "affected his ability to perform some daily life activities, including, but not limited to caring for oneself, concentrating, thinking and working," *id.* ¶¶ 63, 74, which falls squarely within what Congress identified as major life activities under the ADA, *see* 42 U.S.C. § 12102(2)(A). And third, he alleges that the limitation is substantial: He was involuntarily hospitalized for his mental illness, Am. Compl. ¶ 36, which stands out compared to "most people in the general population," *Badwal*, 139 F. Supp. 3d at 310 (cleaned up).

### 2.    Notice

Notice is a crucial element of a failure to accommodate claim, as the ADA does not require employers to "accommodate a[n employee] for a disability of which [it] had no notice of at the time of the challenged action." *Ferrell v. Howard Univ.*, No. 98-cv-1009, 1999 WL 1581759, at *5 (D.D.C. Dec. 2, 1999). "The employee need not apprise the employer of specifics" of his disability or "invoke the magic words 'reasonable accommodation[.]'" *Floyd v. Lee*, 85 F. Supp. 3d 482,

506 (D.D.C. 2015) (cleaned up). But he must "enable the employer to know of both the disability and [his] desire for accommodations for that disability." *Id.* (cleaned up).

### a.    Notice of Disability

Mr. Curwen bears the burden of providing notice of his disability. *See Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 57 (D.D.C. 2012). "Notice can be actual or constructive, but to satisfy the constructive notice requirement, the plaintiff's behavior must be so obviously a manifestation of an underlying disability that it would be reasonable to infer that [the defendant] actually knew of the disability." *Chenari v. George Wash. Univ.*, 172 F. Supp. 3d 38, 52 (D.D.C. 2016).

Accepting Mr. Curwen's allegations as true, the Court finds constructive notice. Mr. Curwen alleges that he began "demonstrat[ing] paranoid delusions" in the spring of 2023 by "expressing to DCI that he believed [its] Human Resources and Information Technology departments were out to get him and were interrupting internet service to his classroom so that he could not access lesson plans." Am. Compl. ¶ 12. He further alleges that "his social media posts became increasingly delusional" during the summer, *id.* ¶ 13; that he "wrote DCI staff with increasingly unintelligible[ and] disturbing language," *id.* ¶ 16; and that during a professional development week, he showed "symptoms typical of schizoaffective bipolar disorder, including anosognosia, grandiosity, pressured speech, racing thoughts, excessive activity, weight loss and altered eating and sleeping patterns," *id.* ¶ 14. And he alleges that "[h]is friends and DCI colleagues became alarmed about his mental state." *Id.* ¶ 16. These allegations satisfy the notice requirement at this early stage. *See, e.g.*, *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 738 (6th Cir. 2015) (finding notice where an employer "knew that [the employee's] fiancée believed he needed to be hospitalized" and the employee "had engaged in strange behavior at a store and sent text messages and emails evidencing illogical and irrational thinking; could not carry on a rational

conversation; had passed a drug test; and was subsequently placed in a psychiatric hospital"); *see also Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) ("[I]t may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability.").

DCI argues that Mr. Curwen did not provide notice of his disability prior to his resignation because he "was neither diagnosed nor receiving treatment for any mental health condition until after that date." Mot. Dismiss at 7–8. But DCI cites no authority for the proposition that a medical diagnosis or ongoing mental health treatment are prerequisites for an employee to provide notice of a disability. *Cf. Ward v. McDonald,* 762 F.3d 24, 31 (D.C. Cir. 2014) ("An individual seeking accommodation need not provide medical evidence of her condition in every case[.]"); *Green v. Am. Univ.*, 647 F. Supp. 2d 21, 29 (D.D.C. 2009) (noting that "a medical diagnosis is not specifically required under the ADA" in order to find the existence of a disability).

**b.    Notice of Reasonable Accommodation Request**

Mr. Curwen must also sufficiently allege that he "first made an affirmative request to [DCI] for accommodations." *Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 87 (D.D.C. 2021). While an accommodation request need not "be in writing or invoke the magic words 'reasonable accommodation,' [it] must make clear that the employee wants assistance with his or her disability so that he or she may return, or continue, to work." *Badwal*, 139 F. Supp. 3d at 313. A reasonable accommodation may include "[j]ob restructuring; part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* at 312 n.12 (cleaned up).

Accepting Mr. Curwen's allegations as true, he has met his burden. He alleges that after "showing symptoms typical of schizoaffective bipolar disorder" in August 2023, he emailed Principal Nace proposing to move to a position focused on curriculum design that "would have allowed [him] to work outside the school building while receiving treatment for his mental illness." Am. Compl. ¶¶ 14, 17. Mr. Curwen then sent Principal Nace a "written proposal" to take on an experiential learning role that "would have allowed [him] to work outside the school building and provide time for him to get treatment for his mental illness." *Id.* ¶ 18. And he alleges that he requested "a leave of absence" while hospitalized. *Id.* ¶ 44. This provided the requisite notice.

Mr. Curwen also alleges that third parties requested accommodations on his behalf. His father emailed DCI on August 21, 2023, to say that his son was "in need of [DCI's] support" and asked that it contact him because Mr. Curwen "did not have access to a phone while hospitalized[.]" *Id.* ¶¶ 37–39. And his mother "repeatedly called [DCI's] HR department and Mr. Rosskamm on [her son's] behalf, asking DCI to engage in the interactive process and provide her son accommodation." *Id.* ¶ 48. This, too, provided notice. *See Evans v. Davis Mem'l Goodwill Indus.*, 133 F. Supp. 2d 24, 29 (D.D.C. 2000) (finding that "a family member, friend or health professional may request accommodation on behalf of a disabled employee" (cleaned up)).

DCI challenges Mr. Curwen's requests as too vague and informal. *See* Mot. Dismiss at 8 ("[Mr. Curwen] attempts to circumvent the fact that he never made a formal request . . . by asserting that, at unspecified times, he reached out to the school principal regarding a curriculum design position and submitted a proposal for the role of experiential learning coordinator."); *id.* ("He does not allege these were existing open positions for which the school could take a teacher out of the classroom."). But DCI never followed up to clarify the nature of Mr. Curwen's requests. An employee's request for an accommodation triggers "an interactive process—a flexible give-and-

take between employer and employee so that together they can determine what accommodation would enable the employee to continue working." *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 73–74 (D.D.C. 2019). And that interactive process is even more important when an employee's disability involves a mental illness, as such a disability can hinder the ability to independently come up with a reasonable accommodation. *See, e.g.*, *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1286 (7th Cir. 1996) (explaining that while "requesting a reasonable accommodation is the employee's responsibility, [the school] cannot place the whole burden of the interactive process on the shoulders of [the plaintiff], who is admittedly suffering from mental problems"). Yet Mr. Curwen alleges that DCI never engaged in such a process or even responded to Mr. Curwen's or his parents' requests. *See* Am. Compl. ¶¶ 14, 17, 18, 44, 37–39, 48. To be sure, DCI may ultimately establish that Mr. Curwen's accommodation requests were unreasonable, but the Court may not resolve that question at this stage.

### 3.    Qualified Individual

Next, Mr. Curwen must demonstrate that he "could perform the essential functions of [his] position either with [a] reasonable accommodation or without it." *Hill*, 897 F.3d at 237; *see also* 42 U.S.C. § 12111(8). And "[g]enerally, the question of what constitutes an essential function of a job is a factual issue to be determined by a jury," *Kirkland v. McAleenan*, No. 13-cv-194, 2019 WL 7067046, at *8 (D.D.C. Dec. 23, 2019) (cleaned up), meaning the bar "is not a high one" at this stage, *Johnson v. DeJoy*, No. 23-cv-2342, 2024 WL 4215557, at *4 (D.D.C. Sept. 17, 2024); *see also Clayborne v. Potter*, 448 F. Supp. 2d 185, 189 n.3 (D.D.C. 2006) ("For purposes of employment discrimination cases, the standards for liability under the Rehab Act and the [ADA] are the same."); *Reid-Witt on behalf of C.W. v. District of Columbia*, 486 F. Supp. 3d 1, 10 (D.D.C. 2020) (same for the DCHRA).

Although the bar is not high at the motion to dismiss stage, Mr. Curwen has not plausibly alleged that he could perform the essential functions of his teaching duties with a reasonable accommodation. Mr. Curwen alleges that if DCI had granted him the proposed modifications to his job responsibilities, he could have "work[ed] outside the school building while receiving treatment for his mental illness." Am. Compl. ¶ 17; *see also id.* ¶ 18. But this falls short of alleging that he could "perform the essential elements of his job[.]" *Johnson*, 2024 WL 4215557, at *4 (granting dismissal where the plaintiff "d[id] not specify what reasonable accommodations would have allowed her to perform the essential functions of her job, or even what she believes the essential functions of her job to be"). And the Amended Complaint indicates that Mr. Curwen was *not* capable of performing his teaching duties when he requested accommodations. He alleges that he made both requests for modified duties in August 2023. Am. Compl. ¶¶ 17–18. And he also alleges that by DCI's "August 2023 professional development week," he was "showing symptoms typical of schizoaffective bipolar disorder, including anosognosia, grandiosity, pressured speech, racing thoughts, excessive activity, weight loss and altered eating and sleeping patterns." *Id.* ¶ 14. Mr. Curwen therefore asks the Court to "draw an inference that stands in direct conflict with the facts as alleged in the [Amended] Complaint." *Badwal*, 139 F. Supp. 3d at 311 (finding that professor failed to sufficiently allege that he was a qualified individual when "he was 'physically incapable' of performing his teaching duties and . . . his injuries prevented his return to the classroom."); *see also Shapiro v. Howard Univ.*, No. 18-cv-2588, 2019 WL 4860876, at *17 (D.D.C. Sept. 30, 2019) (finding that employee with chronic autoimmune disorder who had trouble with basic tasks like walking and standing failed to present "factual allegations from which the court might infer that Plaintiff could perform the essential functions of her position with reasonable accommodation.").

Mr. Curwen's requested accommodation for a leave of absence fares no better. Am. Compl. ¶ 44. The Amended Complaint offers no specifics on the length of the absence he sought, and an employer is "not required to grant" an indefinite leave of absence. *See Sampson v. Citibank, F.S.B.,* 53 F. Supp. 2d 13, 18 (D.D.C. 1999), *aff'd,* 221 F.3d 196 (D.C. Cir. 2000); *see also Bramwell v. Blakey,* No. 04-cv-927, 2006 WL 1442655, at *6 (D.D.C. May 24, 2006); *accord Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 759–60 (5th Cir. 1996) (holding that a reasonable accommodation does not require that employer wait indefinitely for employee's medical condition to be corrected).

For these reasons, Ms. Curwen has not sufficiently alleged that he could perform the essential functions of his employment, which is fatal for his discrimination claims under the ADA and the DCHRA. The Court thus need not address whether DCI refused the accommodation.

## B.    Retaliation (Counts 1, 2, 3, and 4)

Mr. Curwen next brings retaliation claims under the ADA, the DCHRA, the FMLA, and the DCFLMA. *See* Am. Compl. ¶¶ 71, 82, 90, 99. "The ADA's anti-retaliation provision forbids 'discrimina[tion] against any individual because such individual has . . . made a charge . . . under this chapter.'" *Shealayno'sun v. McCarthy,* No. 18-cv-746, 2021 WL 39620, at *6 (D.D.C. Jan. 5, 2021) (quoting 42 U.S.C. § 12203(a)). The DCHRA prohibits an employer from "retaliat[ing] against an employee due to [his] opposition to any practice made lawful by the DCHRA.'" *Stevens v. Nat'l R.R. Passenger Corp.*, 517 F. Supp. 2d 314, 320 (D.D.C. 2007), *aff'd,* 275 F. App'x 14 (D.C. Cir. 2008); *see also* D.C. Code § 2–1402.61(a). The FMLA makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). And the DCFMLA

prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise any right provided by this chapter." D.C. Code § 32-507(a).

Retaliation claims under all four statutes are analyzed under the familiar framework used in retaliation lawsuits brought under Title VII of the Civil Rights Act. *See Shealayno'sun*, 2021 WL 39620, at *6 ("The D.C. Circuit has held that the framework for analyzing anti-retaliation suits under the ADA . . . mirrors that applied in retaliation suits under Title VII of the Civil Rights Act." (citing *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005))); *Ingram v. D.C. Child & Fam. Servs. Agency*, 394 F. Supp. 3d 119, 124 (D.D.C. 2019) (similar for the DCHRA); *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010) (similar for the FMLA); *Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 105 n.7 (D.D.C. 2013) (similar for the DCFMLA). Thus, Mr. Curwen must plead sufficient facts to raise an inference (1) that he "engaged in a protected activity," (2) that his employer "took a materially adverse action" against him, and (3) that "a [but-for] causal connection between the protected activity and the adverse action." *Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 16 (D.D.C. 2016) (cleaned up).

### 1. Eligibility

At the threshold, the Court must consider Mr. Curwen's eligibility under the FMLA and DCFMLA. *See Dougherty v. Cable News Network*, 396 F. Supp. 3d 84, 112 (D.D.C. 2019) (noting that "eligibility under the FMLA is a prerequisite to make an FMLA retaliation claim" (citations omitted)); *id.* at 113 (finding DCFMLA retaliation claim failed as a matter of law where "the evidence undisputably show[ed] that [the plaintiff] was neither eligible under the FMLA nor under the DC FMLA at the time he made his request"). Employees are eligible under the FMLA if they have "been employed by [their] employer for at least 12 months[] and ha[ve] worked at

least 1,250 hours with that employer in the previous 12 months." *Id.* at 106 (citing 29 U.S.C. § 2611(2)(A)). The DCFMLA is "structured similarly, providing eligibility to any employee who has been employed by the same employer for more than a year and has worked at least 1,000 hours for that employer in the previous 12 months." *Id.* (citing D.C. Code § 32-501(1)). At the time of his mental health crisis, Mr. Curwen had been teaching at DCI for seven years, *see* Am. Compl. ¶¶ 9 (began working at DCI in 2016), 12 (began "experiencing symptoms of mental illness" in 2023), 87 ("had at least 1,250 hours of service with Defendant during the prior twelve . . . months"), and DCI does not contest that he had worked the requisite number of hours in the prior twelve months.

DCI's only argument is that "[o]nce [Mr. Curwen] resigned, he was no longer an eligible employee entitled to rights and benefits under the FMLA." Mot. Dismiss at 15. But Mr. Curwen has alleged that he did not resign in the August 18, 2023, 1:54 p.m. email given his mental state. *See, e.g.*, Am. Compl. ¶ 21 (describing the email as a "meandering, disjointed and unintelligible email" that expressed "paranoid beliefs as a basis for the desire to leave DCI" and sought "a leave of absence as an accommodation to allow for treatment of his mental illness"). And he alleges that DCI did not perceive this email as a resignation, but as a request for a leave of absence. *See, e.g.*, Am. Compl. ¶¶ 47 ("An hour after receiving [an email about separation paperwork], Plaintiff emailed [DCI officials.] In that communication, Plaintiff, in response to DCI's representation that Defendant now considered his 1:54 pm email as a resignation, *explained what Defendant had already known* – that he had written that email while experiencing a severe mental health crisis and accordingly, was not competent to make decisions about his employment and wanted to 'take that back.' He also again asked for leave pursuant to the FMLA, and given the rambling nature of his email, was clearly still experiencing mental health issues."(emphasis added)), 31 ("Given the

language in both the 1:28 am email and the 1:54 pm email, Plaintiff's writing itself provided further notice to Defendant that Plaintiff was suffering from mental illness, was experiencing a severe mental health crisis, was incapable of making decisions impacting his employment with Defendant, and that he was requesting a leave of absence as an accommodation."). Accepting those allegations as true, as the Court must as this stage, Mr. Curwen did not resign and is eligible for benefits under the FMLA and DCFMLA. The Court understands that DCI has a different version of the facts surrounding whether Mr. Curwen resigned. But the Court may not resolve that factual dispute, as the allegations in the Amended Complaint control.[1]

### 2.    Protected Activity

Turning to the retaliation claims, Mr. Curwen easily satisfies the first requirement. "Requests for accommodation are 'protected activities' within the meaning of the ADA." *DuBerry v. District of Columbia*, 582 F. Supp. 2d 27, 37 (D.D.C. 2008). And Mr. Curwen alleges that he requested multiple accommodations from DCI. *See* Am. Compl. ¶¶ 17 (requesting to move to a position "focused on curriculum design."), 18 (sending a "written proposal to take on the role of experiential learning coordinator"), 21 (requesting a "leave of absence as an accommodation to allow for treatment of his mental illness"). He also alleges that his parents requested accommodations on his behalf. *See id.* ¶¶ 37–39 (Mr. Curwen's father requesting "support" from DCI), 48 (Mr. Curwen's mother requesting an accommodation). These allegations suffice.

In response, DCI argues only that Mr. Curwen "does not allege that prior to his resignation there was any statutorily protected activity[.]" Mot. Dismiss at 1. But Mr. Curwen *does* allege

---

[1] The Court notes that even at the summary judgment stage, courts have found a genuine issue of material fact as to whether an individual resigned. *See, e.g.*, *Paroczay v. Hodges*, 297 F.2d 439, 440 (D.C. Cir. 1961) (finding the record "created a genuine issue of material fact as to the voluntariness of the resignation"). DCI will have an opportunity to make its case later in these proceedings.

earlier protected activity. *See* Am. Compl. ¶¶ 17–18. And DCI assumes the accommodation requests do not count because Mr. Curwen resigned. *See* Mot. Dismiss at 8–10. But again, Mr. Curwen alleges that he did not resign, and that DCI knew he was requesting a leave of absence and not resigning. *See supra*, at 16–17. These allegations control at this stage.

### 3.    Materially Adverse Action

Mr. Curwen also satisfies the second requirement. "Adverse actions in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Zano v. McDonough*, No. 22-cv-2748, 2024 WL 2699976, at *7 (D.D.C. May 24, 2024) (cleaned up). This means that retaliation actions are "not limited to [those] that affect the terms and conditions of employment." *Paschal v. District of Columbia*, 65 F. Supp. 3d 172, 177 (D.D.C. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Instead, "[a] materially adverse action is one that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (cleaned up).

Mr. Curwen alleges that DCI took adverse action by coercing him to sign a severance agreement, effectively terminating his employment. *See, e.g.*, Am. Compl. ¶¶ 67 (stating that DCI ignored his "incapacity to make competent employment decisions," claimed he had "resigned from employment while in the throes of his severe mental health crisis," and then pressured him to "sign a severance agreement in exchange for three months of health coverage"), 78 (similar), 90 (similar), 99 (similar). "[T]ermination plainly represents materially adverse employment action." *Rogers v. Voltron Data, Inc.*, No. 24-cv-84, 2024 WL 4647644, at *8 (D.D.C. Oct. 31, 2024).

DCI counters that Mr. Curwen "voluntarily resigned and voluntary resignation is generally not considered to be an adverse action." Mot. Dismiss at 12–13 (citation omitted). But DCI asks too much at the motion to dismiss stage. Again, taking Mr. Curwen's allegations as true, his August

18, 2023, 1:54 p.m. email came in the wake of a 1:28 a.m. "rambling, disconnected email, expressing clear signs of schizoaffective bipolar disorder, including . . . anosognosia, grandiosity, pressured speech and racing thoughts," Am. Compl. ¶¶ 19–21, which prompted Mr. Nace to schedule a meeting with him, *id.* ¶ 20. He alleges that the 1:54 p.m. email reflected a worsening mental state, with him expressing a desire to "leave DCI" due to "extreme paranoid beliefs" and seeking "a leave of absence as an accommodation to allow for treatment of his mental illness." *Id.* ¶ 21. Indeed, Mr. Curwen alleges that at least one DCI official "understanding that [Mr. Curwen] was experiencing a mental health crisis" decided to "call the police to check on Plaintiff" but stopped when "he was informed that three of [Mr. Curwen's] DCI colleagues were going to go to [his] home." *Id.* ¶ 22. And he alleges that when he later emailed DCI to once again request leave under the FMLA, he "explained what [DCI] had already known," *i.e.*, "that he had written that email while experiencing a severe mental health crisis and accordingly, was not competent to make decisions about his employment[.]" Accepting these allegations as true, Mr. Curwen did not resign on August 18, 2023, and DCI took a materially adverse action against him by pressuring him to sign a severance agreement.[2]

### 4. Causation

Finally, Mr. Curwen has adequately alleged causation. A plaintiff alleging retaliation "must plead facts that could give rise to a reasonable inference that his employer undertook the alleged

---

[2] In support of its argument, DCI points to *Schofield v. Metro. Life Ins. Co.*, No. 03-cv-357, 2006 WL 2660704, at *8 (M.D. Pa. Sept. 15, 2006), which observed at the summary judgment stage that "it is the perception of the employer that matters" in a scenario like this one. Mot. Dismiss at 17. But this case does not help DCI. Accepting the allegations in the Amended Complaint as true, DCI did not perceive the email in question as a resignation, but as a request for a leave of absence. *See, e.g.*, Am. Compl. ¶¶ 47, 31; *see also supra*, at 16–17, 18–19. DCI disagrees with these allegations, and perhaps its version of the facts will carry the day later in this case. But at this stage, "[b]efore discovery has unearthed relevant facts and evidence," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002), the Court must accept Mr. Curwen's allegations as true.

adverse action because of his protected activity." *Ross v. United States Capitol Police*, 195 F. Supp. 3d 180, 205 (D.D.C. 2016). Causation "may be established if the plaintiff alleges that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter." *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 89 (D.D.C. 2016) (cleaned up). "Courts that accept that 'mere temporal proximity' between a protected activity and an adverse employment action can establish sufficient evidence of causality 'uniformly hold the temporal proximity must be 'very close.'" *Id.* (emphasis omitted) (quoting *Keys v. Donovan*, 37 F. Supp. 3d 368, 372 (D.D.C. 2014) (collecting cases)). And "three months is perceived as approaching the outer limit[.]" *Id.* (cleaned up). Here, Mr. Curwen alleges that he was terminated "because of his disability and for requesting a reasonable medical accommodation." Am. Compl. ¶¶ 69, 80; *see also id.* ¶¶ 90, 99. He first requested accommodations sometime in August 2023, *see id.* ¶¶ 17–18, and he signed the severance agreement on September 6, 2023, *id.* ¶ 49. Mr. Curwen has thus plausibly alleged temporal proximity.

### C.    Interference (Counts 3 and 4)

Next up is Mr. Curwen's claims that DCI interfered with his rights under the FMLA and DCFMLA by "refusing to acknowledge and grant leave[.]" *Id.* ¶¶ 90, 99. The FMLA "guarantees leave to covered employees for, among other purposes, 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1375 (D.C. Cir. 2020) (quoting 29 U.S.C. § 2612(a)(1)(D)). And "[e]mployers may not 'interfere with, restrain, or deny the exercise' of FMLA rights[.]" *Id.* (quoting 29 U.S.C. § 2615(a)(1)). The same standard applies to the DCFMLA. *See Murphy v. District of Columbia*, 590 F. Supp. 3d 175, 185 (D.D.C. 2022).

To plead an FMLA interference claim, a plaintiff must allege "(1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 208 (D.D.C. 2025). Courts look to whether the employer "acted with a reasonable tendency to interfere with, restrain, or deny the exercise of or attempt to exercise an FMLA right." *Id.* (cleaned up). "An FMLA violation prejudices an employee only when the employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief." *Kelly v. Richard Wright Pub. Charter Sch.*, No. 16-cv-1853, 2019 WL 451348, at *4 (D.D.C. Feb. 4, 2019) (cleaned up). The FMLA does not "require employers to reasonably accommodate an employee's disabilities or medical restrictions." *Johnson v. DeJoy*, No. 23-cv-2342, 2024 WL 4215557, at *7 (D.D.C. Sept. 17, 2024). Mr. Curwen meets both requirements.

*First*, he alleges that DCI interfered with the exercise of his FMLA rights. He alleges that both he and his parents requested leave under the FMLA. *See* Am. Compl. ¶¶ 21, (Mr. Curwen "seeking a leave of absence as an accommodation to allow for treatment of his mental illness"), 47 (Mr. Curwen "again asked for leave pursuant to the FMLA"), 44 (Mr. Curwen's father requested "a reasonable accommodation and leave under the FMLA"), 48 (Mr. Curwen's mother "repeatedly called [the] Defendant's HR department . . . asking DCI to engage in the interactive process and provide her son accommodation"). And DCI ignored these requests and instead responded by sending a severance agreement. *Id.* ¶ 45. "[E]mployers are expected to responsively answer questions from employees concerning their rights and responsibilities under the FMLA." *Murphy*, 590 F. Supp. 3d at 188 (cleaned up) (discussing both the FMLA and the DCFMLA). And "[f]ailure to follow [these requirements] may constitute an interference with, restrain, or

denial of the exercise of an employee's FMLA rights[.]" *Id.* (cleaned up) (discussing both the FMLA and the DCFMLA). For this reason, courts have found that "unresponsiveness may itself run afoul of [these] requirements." *Id.* (cleaned up) (collecting cases). Mr. Curwen's allegations are sufficient at this stage.

*Second*, there is clear prejudice arising from DCI's interference. Instead of responding to the requests for leave under the FMLA, *see* Am. Compl. ¶¶ 21, 44, 47, 48 (requests from Mr. Curwen, his father, and his mother), DCI "pressure[ed] [Mr. Curwen] to sign the severance agreement as a means of ridding itself of [him]," *id.* ¶ 50. Loss of employment plainly constitutes prejudice. *See Etheridge v. FedChoice Federal Credit Union*, 789 F. Supp. 2d 27, 39 (D.D.C. 2011) (explaining that prejudice occurs "when the employee has lost compensation or benefits by reason of the violation, sustained other monetary losses as a direct result of the violation, or suffered some loss in employment status remediable through equitable relief" (citation omitted)).

DCI recycles the now familiar argument that Mr. Curwen voluntarily resigned and thus "was no longer an employee at the time the alleged interference occurred." Mot. Dismiss at 14. Again, because Mr. Curwen pleads sufficient facts to raise a plausible inference that he did not resign and that DCI did not perceive his August 18, 2023, email as a resignation, *see supra*, at 16– 17, 18–19, this argument does not save DCI.

### D.    Rescission of Severance Agreement (Count 5)

Finally, Mr. Curwen argues that the severance agreement "is void ab initio or voidable and subject to recission based on duress, undue influence and [his] known incompetency to enter into a binding contract." *Id.* ¶ 103. Under D.C. law, a contract is voidable—*i.e.*, a party can possibly avoid obligations under contract—if the party was mentally incapacitated at the time the contract was signed. *See Hernandez v. Banks*, 65 A.3d 59, 64–67 (D.C. 2013). Mr. Curwen's allegations

that "his mental illness rendered him incapable of forming a binding contract" meet the mark at the motion to dismiss stage. Am. Compl. ¶ 53; *see also id.* ¶ 50 ("Defendant took advantage of [the] Plaintiff's mental illness incapacity and acute need for health coverage by pressuring him to sign the severance agreement as a means of ridding itself of Plaintiff.").

DCI argues that Mr. Curwen must first "tender back what he received under the severance agreement" for rescission to be available as a remedy. Mot. Dismiss at 19. Not so. Mr. Curwen is not required to "to tender [any] benefit he [might have] received at this juncture in order to maintain a cause of action for rescission." *See Klayman v. Judicial Watch, Inc*., No. 06-cv-670, 2007 WL 140978, at *15 (D.D.C. Jan. 17, 2007), *partially vacated on other grounds*, No. 06-cv-670, 2007 WL 1034936 (D.D.C. Apr. 3, 2007). That step will come later should Mr. Curwen choose to pursue this claim. *Cf. Brown v. Hornstein*, 669 A.2d 139, 143 (D.C. 1996) (holding that "one who seeks rescission must indicate to the other party at least the intent to restore the parties to the relative positions they would have occupied if no such contract had ever been made, and this as soon as the disenchanted party learns of the facts" (cleaned up)); *see also Cummings v. Jack Hurwitz, Inc.,* 204 A.2d 332, 333 (D.C. 1964) (party seeking to rescind must do so within a reasonable time after discovery of facts justifying rescission).

DCI also argues that rescinding the severance agreement would offer no relief because Mr. Curwen resigned prior to signing the severance agreement and because it has not been enforced. *See* Mot. Dismiss at 19. But again, Mr. Curwen alleges that he did not resign. *See supra*, at 16–17, 18–19. And he claims that DCI *has* relied on the severance agreement. *See id.* ¶¶ 52, 53 (noting that when his "mother followed up on her August and September phone calls with an October 2023 letter . . . explaining that [Mr. Curwen] was hospitalized . . . and diagnosed with schizoaffective bipolar disorder," DCI, "reliant on the severance agreement, . . . would not engage

in the interactive process and would not provide him a reasonable accommodation"). Accepting those allegations as true, his claim survives.

**CONCLUSION**

For these reasons, the Court denies the Defendant's Motion to Dismiss, ECF No. 10, as to the retaliation claims under the ADA (Count 1), DCHRA (Count 2), FMLA (Count 3), and DCFMLA (Count 4); interference claims under the FMLA (Count 3) and DCFMLA (Count 4); and rescission of severance agreement claim (Count 5). The Court grants the motion as to the discrimination claims under the ADA (Count 1) and DCHRA (Count 2).

 

 

SPARKLE L. SOOKNANAN
United States District Judge

Date:   July 15, 2025